UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION



United States District Court
Southern District of Texas
FILED

FEB - 1 2010

Clerk of Court

| | | |
|---|---|---|
| GREG GLADDEN,<br>*PLAINTIFF* | §<br>§<br>§ | |
| v. | §<br>§ | CIVIL ACTION N0. 4:09-cv-00032 |
| LARRY MORRISON,<br>CRYSTAL MORRISON &<br>S/V JEANETTE MARIE, her sails,<br>engine, appurtenances, etc., *in rem,*<br>*DEFENDANTS* | §<br>§<br>§<br>§<br>§<br>§ | IN ADMIRALTY |

<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

COMES NOW, Plaintiff Greg Gladden and moves for summary judgment against defendants Larry and Crystal Morrison and S/V JEANETTE MARIE.

## I. <u>SUMMARY OF THE ARGUMENT</u>

Maritime law is clear, when one vessel is blown down on another stationary vessel, causing damage to the second vessel, the burden is on the moving vessel to prove that the negligence or other fault of her owners did not cause the allision and that storms do not excuse vessel owners duty to exercise reasonable prudence to secure their vessels to prevent loss or damage to the property of others nearby.

There is no genuine issue of material fact here: the negligent and imprudent securing of JEANETTE MARIE in her slip, despite well publicized warnings of the approach of Hurricane Ike, proximately caused the destruction of

1

DIABLESSE; that DIABLESSE was a constructive total loss; that prior to her destruction, DIABLESSE had a fair market value of $210,000, and that Plaintiff is entitled to recover judgment against Defendants in the amount of $210,000, together with prejudgment interest and costs of suit.

## II. FACTUAL BACKGROUND

### A. The Destruction of S/V DIABLESSE

Plaintiff Greg Gladden was the owner of the sailing yacht DIABLESSE, which he properly secured on September 11 and 12, 2008, in her slip at Harborwalk Marina in Hitchcock, Texas.[1]   Defendants owned and maintained the vessel JEANETTE MARIE that was also kept in a slip at the Harborwalk Marina.[2]   Both vessels were located on Pier E.[3]  The JEANETTE MARIE was located in the last slip on the end of Pier E with a finger pier and an open slip between her and the DIABLESSE slip.[4]

On or about September 10, 2008, Hurricane Ike entered the Gulf of Mexico and began moving towards the Texas Coast.  There were several warnings about the approach of Hurricane Ike.[5]  Defendants had notice of the magnitude of the storm and the probability that it would make landfall in Galveston, TX.[6]

---

[1] Declaration of Greg Gladden at Para. 4, 8, and 14.
[2] Depositions of Larry Morrison at 63:23 – 64:2; Deposition of Crystal Morrison at 16:8.
[3] Gladden at 9; L. Morrison at 47:17 – 49:16.
[4] Gladden at 9; L. Morrison at 19:6 – 25; C. Morrison at 43:11 – 20.
[5] *See* National Weather Service: National Hurricane Center, at
http://www.nhc.noaa.gov/archive/2008/IKE.shtml? (The National Weather Service posted

Defendant Crystal Morrison prepared the JEANETTE MARIE for Hurricane Ike unassisted.[7]   She received an extra dock line from a neighboring boat owner but did not have any help tying the JEANETTE MARIE up in her slip.[8]   Crystal Morrison did not ask for any advice or assistance while securing her vessel.[9]   She is not sure why she tied the boat up in the fashion that she did but just decided to add a few additional lines in preparation for the oncoming hurricane.[10]

Plaintiff became aware of Hurricane Ike's path and then spent at least two days on his boat preparing the DIABLESSE for the storm.[11]   Plaintiff doubled all dock lines by adding most of a 600-foot spool of 5/8's inch new dock line.[12]   He added chafe protection, additional fenders, removed sail and windage, closed all sea cocks, and plugged the exhaust.[13]   Plaintiff also removed weight from the boat, deployed her best anchor, drained the tanks, disconnected power cords, verified batteries were charged, and bilge pump was clean and functional.[14]   He then

---

Hurricane Ike forecast advisories from its inception as a tropical depression until it reached hurricane status and made landfall in Galveston, TX.  As Ike approached Galveston updates were posted nearly every three hours.)
[6] L. Morrison at 31:25.
[7] C. Morrison at 21:3 – 8, 30:8 – 14.
[8] *Id.* at 23:19 – 25:11.
[9] *Id*. at 30:19-31:3.
[10] *Id*. at 34:21-35:11.
[11] Gladden at 13-14.
[12] Gladden at 14.
[13] *Id*.
[14] *Id*.

battened down all hatches and had DIABLESSE secure and facing into the expected direction from which the storm would come.[15]

Defendants were beginning sailors who had little to no training.[16]  Defendants had no training in how properly to secure their vessel.[17]  They did not know the age of their lines,[18] their breaking strength,[19] whether the lines had previously been stressed in a storm,[20] in the year and a half they owned the JEANETTE MARIE they did not buy any new dock lines,[21] and did not understand the use of chaffing gear.[22]  Defendants bought supplies from the West Marine store and catalog, giving them access to information about the importance of chafing gear, the different types of dock lines, and their breaking strength.[23]  Defendants did not attend any classes on hurricane preparedness or classes specific to docking systems.[24]  The only thing defendants did differently in tying up the JEANETTE MARIE in preparation for Hurricane Ike was to throw on more lines than they usually used.[25]

---

[15] *Id.*
[16] L. Morrison at 12:6 – 13:16; C. Morrison at 28:8 – 12, 32:25 – 33:20.
[17] L. Morrison at 41:10 – 15.
[18] L. Morrison at 44:14 – 16; C. Morrison at 26:6 – 7.
[19] C. Morrison at 26:6 – 12.
[20] L. Morrison at 52:7 – 13.
[21] L. Morrison at 43:8 – 44:13, 46:7 – 17.
[22] L. Morrison at 45:7 – 8; C. Morrison at 35:12 – 36:2.
[23] C. Morrison 28:13 – 29:7; Newberry Exhibit 4 West Marine 2008 Catalog Pages 244, 245, 248.
[24] L. Morrison at 41:10 – 15.
[25] C. Morrison 35:1 – 11.

Despite the Defendants lack of qualifications to properly secure their vessel and their awareness of the magnitude of the approaching storm they did not ask for assistance in securing the JEANETTE MARIE.[26]

On September 13, 2008, Hurricane Ike made landfall at Galveston, Texas, as predicted. Ike came ashore as a Category 5 hurricane based on its tidal surge but only a Category 2, based on its wind velocity. Sometime during the night of September 13, 2008, as Ike passed over Galveston Bay, S/V DIABLESSE was holed and sunk in her slip. The next morning, S/V JEANETTE MARIE was found floating loose in DIABLESSE's slip and over the top of DIABLESSE, which was sitting on the bottom. Upon hauling DIABLESSE out of the water for inspection, it was determined that she had been holed by something that had battered her on her starboard side, below the water line, during the storm.[27]  DIABLESSE was declared a constructive total loss.

Plaintiff sued defendants *in personam* and JEANETTE MARIE, *in rem*, for tortious destruction of his vessel.  In their answer, defendants alleged that plaintiff's claims are barred by his contributory negligence and assumption of the risk. Defendants have refused throughout the discovery period to give any facts or law to support their affirmative defense theories.

---

[26] C. Morrison 30:8 – 31:3.
[27] Gladden Exhibits 14 – 17 attached to Declaration of Gladden.

### B.   Plaintiff's Expert Opinion

Plaintiff has designated a well-qualified marine expert to testify in this matter and timely produced a copy of his report on December 2, 2009.[28]  Roy Newberry's expert report contains information addressing the cause of the destruction of the DIABLESSE, the failure of the defendants to exercise reasonable care, and the fair market value of the DIABLESSE immediately prior to her destruction.  Mr. Newberry has extensive knowledge regarding condition and valuation services, damage surveys, and accident investigations.[29]  He has worked with and represented Lloyds of London Insurance Company, State Farm, and Farmers Insurance Company as well as many other reputable insurance companies.[30]  Mr. Newberry has held and continues to hold various professional licenses including an active membership in the Society of Accredited Marine Surveyors.[31]  Mr. Newberry's extensive training, knowledge, and experience in accident investigations and valuation services will help in the Court's determination of the material facts of this case.  His opinions are uncontraverted.

---

[28] On November 3, 2009, defendants designated Louis H. Stahlberg as an expert witness but the defendants failed to follow the Rule 16 Scheduling Order provided by the court.  The amended scheduling entered April 16, 2009, required expert reports to be served within sixty days of their designation.  Defendants have failed to produce any expert report.  (Declaration of Gladden at Para. 25)

[29] Declaration of Roy Newberry at Para. 8 – 9.

[30] *Id. at 7.*

[31] *Id. at 11.*

Mr. Newberry's report includes a detailed report on his expert opinion concerning the allision of JEANETTE MARIE with DIABLESSE. This report addresses the cause of the destruction of DIABLESSE and the failure of the defendants to exercise reasonable care. Mr. Newberry was provided with photographs taken before and after the storm of the JEANETTE MARIE in her slip. He was also given a copy of the defendants' depositions, which included statements of their preparations for the storm, to use in his final analysis of the allision. In his report, Mr. Newberry provides a narrative of his findings and includes a detailed illustration of the path the JEANETTE MARIE took prior to alliding with the DIABLESSE.[32] After reviewing the depositions, statements, photographs and other relevant documents, plaintiff's expert, Roy Newberry, came to the following conclusions:

- Very poor preparation was made to secure the JEANNETTE MARIE in advance of the approaching storm.[33]

- There was no evidence the owners attempted to properly install chafe protection on any of the dock lines.[34]

- The JEANETTE MARIE had broken loose from her slip, crashed through a finger pier, and allided with the DIABLESSE.[35]

---

[32] Newberry Exhibit 2, *Damage Report, Storm Mooring Procedures and Precautions, Sequence of the Event and Yacht Evaluation* by Roy Newberry.
[33] Newberry at 25.
[34] *Id.* at 24(c).
[35] *Id.* at 20.

- There was no evidence of the failure of the dock the JEANETTE MARIE was moored to.[36]

- The boat broke loose because the dock lines in place were in poor condition and too small for this size boat.[37]

- No mooring cleats had pulled out of the dock that held the JEANETTE MARIE in place.[38]

- No cleats on JEANETTE MARIE had broken or pulled out.

- Failure to properly secure the JEANETTE MARIE with appropriate lines for the incoming hurricane resulted in a total loss of the DIABLESSE.

Mr. Newberry's report also includes a fair market valuation of the DIABLESSE prior to its destruction by the JEANETTE MARIE.  Mr. Newberry interviewed Mr. Gladden, reviewed an extensive list of equipment provided to him by Mr. Gladden, noted all improvements made to the DIABLESSE, and observed photographs taken of the DIABLESSE prior to it's destruction.[39]  After evaluating the information given to him, Mr. Newberry estimated that the value of the DIABLESSE would have been around $210,000.[40]

---

[36] *Id.* at 24(e).
[37] *Id.*
[38] *Id.*
[39] Newberry at 17.
[40] *Id.* at 37.

## III. SUMMARY JUDGMENT STANDARD

### A. Movant is Entitled to Summary Judgment where there is No Genuine Issue of Material Fact and the Law Entitles Movant to a Judgment

Summary judgment is required if the movant establishes that there is no genuine dispute of material fact and the law entitles it to judgment. FED. R. CIV. P. 56(c). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986).

The Fifth Circuit, however, has suggested that a more lenient summary judgment standard may be applicable to cases set for a bench trial. *Smith v. Rivera*, 2003 U.S. Dist. LEXIS 13692, at *5-6 (N.D. Tex., 2003) (citing *Illinois Central Railroad Co. v. Mayeux*, 301 F.3d 359, 362 n.1 (5th Cir. 2002)); *United States Fidelity and Guaranty Co. v. Planters Bank & Trust Co.*, 77 F.3d 863, 866 (5th Cir. 1996); *In the Matter of Placid Oil Company*, 932 F.2d 394, 398 (5th Cir. 1991). "Under the suggested more lenient standard, the district judge could grant summary judgment based on inferences drawn from incontrovertibly proven facts, so long as there is no issue of witness credibility." *Illinois Central Railroad Co.*, 301 F.3d at 362 n.1.; *see United States Fidelity and Guaranty Co. v. Planters Bank*

*& Trust Co.*, 77 F.3d at 866 (finding that "even at the summary judgment stage a judge in a bench trial has the limited discretion to decide that the same evidence, presented to him or her as trier of fact in a plenary trial, could not possibly lead to a different result.").

    B. <u>While Negligence Claims Often Involve Issues of Fact, this Case is a Case for Expert Testimony, of which Defendants have None.</u>

Expert testimony is required when "a subject is so esoteric that jurors of common judgment and experience cannot form a valid conclusion." *Wyatt by Caldwell v. Wyatt*, 526 A.2d 719 (N.J. App. Div. 1987) (holding that testimony on the cause of accident was inadmissible without expert testimony). In *Diefenbach v. Sheridan Transp.*, the Court held that expert testimony was necessary to assist the trier of fact because this case involved docking and undocking procedures for, and equipment used on, a complex vessel - subjects beyond the scope of common knowledge. 229 F.3d 27, 29 (1st Cir. 2000); *see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 89 (2d Cir. 2006) (noting "expert testimony is usually necessary to establish a causal connection between an injury and its source unless the connection is a kind that would be obvious to laymen . . ."). Similarly, this is a case, where expert testimony is necessary to establish the fair market value of DIABLESSE immediately prior to her loss. Plaintiff timely named his expert and timely produced his report. Although defendant has named an expert, they have

failed to provide a report. Deadlines for discovery, expert reports production and motions has passed. Summary judgment is proper. Defendant's expert report was ordered to be disclosed by January 2, 2010. Motion cut off date for this case was February 1, 2010. Discovery ordered completed by January 4, 2010. Adequate time has been allowed for discovery. Discovery has been completed. Bench trial is scheduled for May/June 2010.

Defendant cannot use any expert testimony in a motion, at a hearing, or at trail, unless they were substantially justified or their nondisclosure was harmless. FRCP 37(c)(1). See: *Hoffman v. Construction Prot. Serv,* 541 F.3d 1175,1179(9th Cir. 2008). This prohibition is automatic without the need for a motion. 1993 Notes to FRCP 37 at para. 9, p. 1101 O'Connor's Federal Rules – Civil Trials; 7 Moore's Federal Practice 3d §37.60 [2][a]; *Hoffman*, 541F.3d at 1190.

## IV.   THE AFFIRMATIVE DEFENSES OF CONTRIBUTORY NEGLIGENCE AND ASSUMPTION OF THE RISK ARE NOT RECOGNIZED IN ADMIRALTY

*Luke v. Veazey*, 290 F2d 33, 35 (5th Cir. 1961) (holding in admiralty that contributory negligence and assumption of the risk are not available defenses); *Bush v. Oceans International*, 621 F.2d 207, 211 (5th Cir. 1980) ("Congress specifically declared its intention to retain the admiralty principles of comparative negligence and preclusion of the defense of assumption of the risk."); *Byrd v. Reederei*, 638 F.2d 1300, 1306 (5th Cir. 1981) (determining that in admiralty the

concept of comparative negligence shall apply rather then the common law rule of contributory negligence and the "the admiralty rule which precludes the defense of assumption of risk…shall be applicable").

V.   The Burden is on Defendants to Prove that they Were Not Negligent or that their Negligence did Not Cause the Destruction of DIABLESSE

According to long-standing admiralty principles, set forth by the Supreme Court, an unmoored vessel that drifts into an allision with a moored vessel is presumed to be at fault, shifting the burden of proof to defendant.   In *The Louisana*, 70 U.S. 164 (1865), the Supreme Court held that the drifting vessel is presumptively liable for damages "*unless [it] can show* affirmatively that the drifting was the result of [an] inevitable accident, or a *vis major, which human skill and precaution, and a proper display of nautical skill could not have prevented.*" *Id* at 173.  (Emphasis added.)  This burden shifting rule, while venerable, is still good law.  *See, e.g., Signal Int'l, supra*, and *Hood v. Knappton Corp., Inc.*, 986 F.2d 329, 332 (9th Cir. 1993).

The facts in *The Louisana* are similar to those before the Court here.  There, the vessel broke free after the tide and wind conditions changed.  70 U.S. at 173. The Court held that under the circumstances, although the vessel was sufficiently secured at the time it was first moored, once the tide and wind conditions changed, proper precautions should have been take to prevent the vessel from breaking away. *Id* at 174.  Defendants failed to carry their burden of proving that they were

not negligent in failing to resecure the vessel after the wind and tide changed.

Application of the rule in *The Louisiana* is not excused because JEANETTE MARIE broke free during a hurricane.  This is simply one of the factors affecting the degree of care required of defendants under the circumstances.  *Signal Int'l LLC Limitation Proceedings*, 2009 A.M.C. 2177, 490 F.3d 478 (5th Cir. 2009).

Additionally, Courts have held that there is a presumption of fault at the time of the accident when there is a failure to take proper precautions in face of an approaching storm.  *See, e.g., Weyerhaeuser Co. v. Atropos Island*, 777 F.2d 1344, 1348 (9th Cir. 1985); *see also Bunge Corp. v. Freeport Marine Repair, Inc.*, 2001 A.M.C. 1367, 1375, 240 F.3d 919, 926 (11 Cir. 2001) (winds ranging between 85 mph and 103.5 mph were not "of such force that no reasonable preparations would have prevented [the ship] from breaking free from her moorings.").

It is the unrebutted opinion of the only expert testifying in this case, that during Hurricane Ike, JEANETTE MARIE's dock lines failed, causing her to be blown down on top of DIABLESSE, pounding a hole in her and causing DIABLESSE to sink in her slip where, until then she had been safely moored.[41] Thus, the rule in *The Louisiana* is triggered and the burden is on defendants to prove that they did not negligently secure JEANETTE MARIE in her slip or that

---

[41] Newberry at 20 – 22.

Ike was of such magnitude that no reasonable precautions would have prevented JEANETTE MARIE from breaking free and careening about the harbor.

### VI.   A HURRICANE IS NO EXCUSE FOR THE FAILURE TO TAKE REASONABLE PRECAUTIONS TO SECURE A VESSEL SO THAT SHE DOES NOT DAMAGE THE PROPERTY OF OTHERS

The commonly held belief that a vessel that is destroyed in a hurricane is an Act of God for which no one is responsible is simply wrong.

### A. Hurricanes, Like Any Other Natural Phenomenon, Require Reasonable Precautions to Avoid Damage to Others

It is well-established law that a hurricane is foreseeable in the Gulf Coast during September and October (hurricane seasons) and the Courts will not consider the mere arrival of a hurricane as an Act of God. *See King Fisher Marine Service, Inc. v. Petroleos Mexicanos*, 1970 A.M.C. 1459 (5th Cir. 1970); *Signal Int'l LLC Limitation Proceedings*, 2009 A.M.C. 2177, 579 F.3d 478 (5th Cir. 2009); *Crescent Towing & Salvage Co., Inc. v. M/V Chios Beauty,* 2008 AMC 2535, 2552 (E.D. La. 2008).

"One is chargeable with knowledge of the usual effect of ordinary natural conditions or forces upon his negligent act or omission, and is held to have contemplated the appearance and the effect of such conditions and forces upon his negligence." *Mariner, Jacobson v. Suderman & Young, Inc.*, 1927 A.M.C. 363, 17 F.2d 253  (5th Cir. 1927).  When the natural forces are foreseen or reasonably may

14

have been foreseen by a negligent party, he may be held liable for any harm, which could have been avoided by the exercise of reasonable care. *Id.*; *Cachick v. United States*, 161 F. Supp. 15 (S.D. Ill. 1958); *Benedict Pineapple Co. v. Atlantic Coast Line R. Co.*, 55 Fla. 514, 46 So. 732 (1908). The test for foreseeability resembles the test for proximate cause, that is, whether the injury and the actual harm were reasonably foreseeable. *Holtz v. J.J.B. Hillard W.L. Lyons, Inc.*, 185 F.3d 732, 742 (7th Cir. 1999); *Del Signore v. Asphalt Drum Mixers*, 182 F. Supp.2d 730, 741 (N.D. Ind. 2002).

When reasonable preparations may be taken to prevent destruction and damage to another's property during foreseeable weather conditions (i.e. hurricane), it is the ship owner's responsibility to take such precautions, *Signal Int'l LLC*, 2009 A.M.C. at 2183, and the failure to do so is considered negligence, *Id.* Further, the 5th Circuit has held that it is the responsibility of the ship owner to employ tested methods for securing vessels in the face of a storm. *Id.* The fact that defendants did not know the age, size or breaking strength of JEANETTE MARIE's dock lines or whether they had previously been stressed in prior storms, did not use anti-chafe gear or care to learn about basic storm prepation is evidence of negligence. In *Signal Int'l*, the Fifth Circuit reasoned that "Signal's negligence, in employing an improvised untested method of securing the MISS TIFF and the JACK KING using nylon ropes, caused the allision." *Id.* Because Hurricane Ike

15

was a known storm and its time and location of expected landfall were reasonably foreseeable well in advance, it was defendants' duty to take all reasonable precautions to protect the property of others nearby.

In order to prove that the destruction of S/V DIABLESSE was an act of God, defendants must prove that the accident could not have been prevented by human skill and precaution. *Kansas City Southern Railway Company v. Barge HBC 8106*, 642 F. Supp. 609 (W.D. La. 1986). In other words, the burden is on defendants to prove that no reasonable efforts to secure JEANETTE MARIE in her slip would have been sufficient to prevent her from breaking loose and causing damage to the property of others nearby.

### B. The Fact that JEANETTE MARIE had to Break Through an Intermediary Pier to Get to DIABLESSE is of No Consequence

An intermediary finger pier separated JEANETTE MARIE and DIABLESSE in their slips that JEANETTE MARIE had to batter her way through to get to DIABLESSE to hole and sink her. This fact is of no consequence in terms of proximate causation. In *Petition of Kinsman Transit Co*, the Second Circuit analyzed the damages for which a vessel could be held liable under standard Palsgraf analysis, concluding that there is a duty owed when a vessel is within the area of hazard. 338 F.2d 708, 719, 721 (2d Cir. 1964) ("*Kinsman I*"). The MACGILVARY SHIRAS ("SHIRAS") was docked on the south side of the Buffalo River, three miles upstream from the Michigan Avenue Bridge. *Id.* After a

period of frozen weather, ice formed on the Buffalo River which then thawed, creating large chunks of ice and debris. Because of the way SHIRAS was secured to the dock, much of it piled up between SHIRAS' starboard bow and the bank. *Id.* This effect exerted pressure on the mooring lines and stern lines, which caused the shore bits and bollards (effectively large cleats to which dock lines are tied) to pull out of the ground, sending SHIRAS careening down stream in the current. *Id.* Because SHIRAS' ship keeper took no action to ready the anchors or properly prepare for the thawing of the ice, the judge determined that his negligence was the cause in fact of the damage that ensued. *Id.*

As SHIRAS careened down the river, she collided with another ship, TEWKSBURY, which caused both ships to careen out of control downstream. *Id.* A call was placed to the bridge crew to let them know of the out-of-control ships heading downstream and requesting that the bridge be raised. *Id.* However, it took almost 30 minutes for the bridge crew to begin raising the bridge. Before they could get it up and out of the way, TEWKSBURY allided with the bridge. *Id.* Both ships ended their journey on the south side of the river. *Id.* The court determined that the inclement weather conditions were not beyond the range of foreseeability and that the accident could have been prevented if SHIRAS' owners had taken proper precautions in securing SHIRAS. *Id.* Consequently, the Court held under a *Palsgraf* analysis, that SHIRAS was the *proximate cause* of the

collisions and accidents that occurred as a result of her owner's negligent failure

properly to secure her in anticipation of the advancing weather. "[A] ship

insecurely moored in a fast flowing river is a known danger not only to herself but

to the owners of all other ships and structures down-river, and to persons upon

them." *Id* at 722.  The owner of a vessel has a duty of care to all within range of

the vessel's known destructive power. *Id.*  In this case, the owners were negligent

in their preparations given the predicted weather conditions and:

> [W]here . . . the damages resulted from the same physical forces
> whose existence required the exercise of greater care than was
> displayed and were of the same general sort that was expectable,
> unforeseeability of the exact developments . . . will not limit liability.

*Id.* at 726.

The rule in *Kinsman I* is alive and well in the Fifth Circuit.  In *Signal

International,* the Fifth Circuit analyzed the liability of a vessel owner during a

hurricane.  *Signal Int'l v. Mississippi Department of Transpiration*. 579 F.3d at

478.  During Hurricane Katrina, vessels owned by Signal International ("Signal")

broke free from their moorings and allided with and damaged a highway bridge

roughly five miles away. *Id* at 483.  Defendant argued that because the vessel had

to travel over low-lying areas surrounding the River, it was not foreseeable that it

could crash into the bridge five miles away from its original location. *Id.*

However, the determination of the court was not based on the location of the

accident, but rather the general risk of allision caused by the negligent failure

properly to secure a vessel in the area of hazard. *Id.* at 492. The court considered "the topology of the area, [and whether] the Interstate 10 bridge was within the general class of fixed structures in the low-lying areas near the Pascagoula River against which . . . [the vessels] could foreseeably allide when propelled by the anticipated storm surge." *Id.* Signal was found to be negligent because it used untested methods of securing its vessels and proper and reasonably available preparations could have prevented the allision because the conditions were foreseeable. *Id.* The court held it was foreseeable that if a vessel broke free from her moorings, it could be blown a considerable distance, crashing into other vessels, structures and even a highway bridge, and that in this case the distance of almost five miles did not render Signal's negligence no longer a "*proximate*" cause. *Id.* at 493. "The test of foreseeability is not measured against normal conditions, but those that were anticipated or reasonably should have been anticipated." *Id.* Ultimately, as a matter of law, Signal owed a duty to the owner of the bridge because the general risk of allision with a bridge structure located within the reach of the anticipated storm surge was foreseeable if their vessels broke free.

The only thing that separated JEANETTE MARIE and DIABLESSE was a finger pier. It is entirely foreseeable that if a heavy displacement vessel like JEANETTE MARIE were to break free of her dock lines, she would crash through

the adjacent finger pier and ram nearby vessels.  As in *Kinsman I* and *Signal International*, because the holing and sinking of nearby vessels was entirely foreseeable as the result of the failure properly to secure JEANETTE MARIE, the negligence of JEANETTE MARIE's owners is not only the cause in fact of the destruction of DIABLESSE, it is the proximate cause of that destruction.

## VII.  ON A CONSTRUCTIVE TOTAL LOSS, DAMAGES ARE MEASURED BY THE FAIR MARKET VALUE OF THE PROPERTY IMMEDIATELY PRIOR TO ITS LOSS

Fair market value is not the same as insured value, instead it is what the property could have been sold for in the geographical market area in which the property was located, assuming a willing buyer and willing seller.

The geographical market for a vessel such as DIABLESSE, was at a minimum, the entire United States.  The popularity of this model sailing vessel is such that people travel from all over the world to find and purchase a Beneteau First 42.[42]

---

[42]  Newberry at 35, Gladden at 5.

VIII.  <u>DEFENDANTS CANNOT MEET THEIR BURDEN OF PROVING THAT THE DESTRUCTION OF DIABLESSE WAS NOT PROXIMATELY CAUSED BY THEIR NEGLIGENCE</u>

A. <u>Defendant's Conduct was Unquestionably Negligent</u>

The mere facts alone that Defendants have testified that they were beginner sailors with no training on how to secure their vessel properly is evidence that the destruction of DIABLESSE was not an act of God but rather the negligence of defendants during reasonably foreseeable weather conditions in the Gulf Coast.

In fact, defendants have admitted that they were aware of the approach of Ike, its probable landfall and the need to secure their vessel in anticipation of its arrival.[43]

As demonstrated by National Oceanic and Atmospheric Administration (NOAA)[44] the anticipated magnitude of winds and seas was predicted well in advance of Ike's arrival.  The need to prepare was well known.   As it turned out, while Ike caused substantial damage to property in the Houston/Galveston area, the winds were only those of a Category II storm while the tidal surge was that of a Category V storm.  Because the vessels at issue were in a marina that had floating piers and those piers remained in place throughout the hurricane, it is only the wind that is at issue here.[45] The key fact here is that the maximum sustained winds never

---

[43] L. Morrison at 31:2 – 25; C. Morrison, at 22:11 – 25; 23: 1 – 7.
[44] NOAA Exhibit 1:1 – 4  attached
[45] Newberry at 30

exceeded the predicted 110 miles per hour. Thus, in terms of wind, Ike was no surprise at all.[46]

Here, defendants used chafed, frayed lines of unknown age, history and breaking strength, and lines without chafe protection, each of which actions falls below the standard of prudent conduct. Beyond the negligence found in *Signal Int'l.*, rather than using an unproven method to secure their vessel, defendants used a method that is unquestionably negligent. The use of lines of insufficient size and strength, run around edges that will cut the line, failing not only to have and employ anti-chafe gear but even where it was present on a line, failing to utilize it, is unquestionably conduct that falls far short of prudent practices.[47] In fact, the manner in which JEANETTE MARIE was secured in anticipation of the storm, virtually assured that the lines would fail.[48]

B. Analyzed on a Cost/Benefit Basis, Defendants' Conduct Fell Well Below the Standard of Reasonable Care

The Seventh Circuit has used the following test to determine whether a defendant is negligent in their actions:

> . . . a defendant is negligent if the burden (cost) of the precautions that he could have taken to avoid the accident (B in [Judge Learned] Hand's formula) is less than the loss that the accident could reasonably be anticipated to cause (L), discounted (i.e. multiplied) by the

---

[46] NOAA Exhibit 2:1 – 5 attached
[47] Newberry at 24.
[48] Newberry at 25.

probability that the accident would occur unless the precautions were taken. So: B<PL. The cost-justified level of precaution (B) -- the level that the defendant must come up to on penalty of being found to have violated his duty of due care if he does not -- is thus higher, the likelier the accident that the precaution would have prevented was to occur (P) and the greater the loss that the accident was likely to inflict if it did occur (L). Looked at from a different direction, the formula shows that the cheaper it is to prevent the accident (low B), the more likely prevention is to be cost-justified and the failure to prevent therefore negligent. Negligence is especially likely to be found if B is low and both P and L (and therefore PL, the expected accident cost) are high.

*Brotherhood Shipping Co., Ltd. v. St. Paul Fire & Marine Insurance Company*, 1993 A.M.C. 2729, 2734, 985 F.2d 323, 327 (7th Cir. 1993).

Using this test, the cost for defendants to secure their vessel properly in anticipation of the predicted storm was inconsequential as compared to the likelihood of significant damage to the property of others.   The value of DIABLESSE was in excess of $200,000.[49]   The cost of new dock lines for JEANETTE MARIE would have been under $350.[50]   Crystal Morrison in fact spent some time on JEANETTE MARIE attempting to secure her for the storm. The time to do the job properly would have added nothing to the time invested. The probability of damage to nearby property from a Hurricane predicted to bring winds at the 74 to 91 mile per hour range was extremely high.[51]   The probability of

---

[49] Newberry at 37.
[50] *Id.* at 34.
[51] *Id.* at 19.

significant damage to the property of others nearby from improperly secured vessels breaking free and hammering properly secured vessels was equally high.[52] The cost of securing JEANETTE MARIE correctly was inconsequential compared the probability and magnitude of the loss form an improper job.   The failure properly to secure JEANETTE MARIE cannot be excused on a cost/benefit analysis.

IX.   <u>THERE IS UNCONTROVERTED EVIDENCE THAT THE LOSS OF S/V DIABLESSE WAS DUE SOLELY TO ITS BEING RAMMED BY S/V JEANETTE MARIE DURING THE STORM</u>

While no one saw the JEANETTE MARIE ram DIABLESSE until she holed her and drove her to the bottom, there is no question that that is precisely what happened.  After the storm, DIABLESSE was found on the bottom, still in her slip and still tied to the dock.[53] JEANETTE MARIE, on the other hand, was found floating in the DIABLESSE's slip, over the top of her.[54]  Pieces of DIABLESSE were found on the deck of JEANETTE MARIE and paint from the underside of DIABLESSE was found on the hull of JEANETTE MARIE.   The finger pier that should have been separating the two, was also found to have been broken to pieces.

---

[52] *Id.*, at 28.
[53] Gladden at 16.
[54] Gladden at 19.

Defendants have no information about how their vessel got where it was[55] and no expert to contradict the opinion of Roy Newberry.[56] Mr. Newberry clearly concludes that it was JEANETTE MARIE that holed DIABLESSE and caused her to sink and that event was due to the negligent job done in attempt to secure JEANETTE MARIE in her slip.

## X. PLAINTIFF IS ENTITLED TO RECOVER THE FAIR MARKET VALUE OF DIABLESSE

The Uncontroverted Declarations of Greg Gladden and Roy Newberry establish that the cost of repairing DIABLESSE exceeded her fair market value of $210,000. Defendants have no evidence to the contrary. There is no genuine dispute of material fact that DIABLESSE was a constructive total loss entitling Plaintiff to a judgment in the amount of $210,000, plus prejudgment interest and costs.

## XI.   CONCLUSION

The duty under maritime law is clear, to make reasonable efforts properly to secure a vessel to prevent damage to others from reasonably anticipated storms, including hurricanes. Equally clear, the burden under maritime law is on Defendants to prove that their negligence did not cause the destruction of DIABLESSE.

---

[55] L. Morrison at 21:5 – 13; C. Morrison at 36:9 – 23.
[56] Gladden at 25.

25

There is no genuine dispute of material fact:  it is uncontraverted that the negligent and imprudent securing of JEANETTE MARIE in her slip, despite well publicized warnings of the approach of Hurricane Ike, proximately caused the destruction of DIABLESSE; that DIABLESSE was a constructive total loss; that prior to her destruction, DIABLESSE had a fair market value of $210,000, or that Plaintiff is entitled to recover judgment against Defendants in the amount of $210,000, together with prejudgment interest and costs of suits.

Respectfully submitted,

DATED:  February 1st, 2010          /s/

GREG GLADDEN
Law Office of Greg Gladden
3017 Houston Avenue
Houston, Texas 77009
Phone: 713.880.0333
Fax: 713.880.4018
State Bar No. 07991300
Southern District Federal ID No. 7236

JAMES C. WINTON
Baker & Hostetler LLP
1000 Louisiana, 20th Floor
Houston, Texas 77002-5009
Phone: 713.646.1304
Fax: 713.751.1717
State Bar No. 21797950
Southern District Federal ID No. 10697

26

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing Plaintiff's Motion for Summary Judgment has been served on counsel of record this 1st day of February 2010 via the Clerk's electronic service and hand delivery at her address:

> Ms. Noel Lewandos
> 4848 Loop Central Drive, Suite 610
> Houston, Texas  77081

> _____/s/ Gregory C. Gladden_____
> Gregory C. Gladden

27